IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| WILLIAM DEANS, | ) Civil Action No. 3:12-662-MGL-JRM |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )**REPORT AND RECOMMENDATION** |
| | ) |
| DR. WADMAN, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

Plaintiff filed this action, pro se, on March 15, 2012.[1] He is involuntarily committed to the Sexually Violent Predator Treatment Program ("SVPTP") at the South Carolina Department of Mental Health ("SCDMH") as a Sexually Violent Predator ("SVP") pursuant to the South Carolina Sexually Violent Predator Act, S.C. Code Ann. §§ 44-48-10 through 44-48-170. Plaintiff filed an amended complaint on August 3, 2012. Defendant[2] is Dr. Peggy Wadman, a physician who was employed as the Medical Director of the SVPTP at the time of the alleged incidents. See Wadman Aff., ¶¶ 1-2, ECF No. 70-1. Plaintiff appears to allege that Defendant violated his constitutional rights by failing to provide him with adequate medical care.

On November 19, 2012, Defendant filed a motion for summary judgment. Because Plaintiff is proceeding pro se, he was advised on November 20, 2012, pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), that a failure to respond to Defendant's motion for summary judgment with additional evidence or counter-affidavits could result in the dismissal of his complaint. Plaintiff filed

---

[1]All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Civil Rule 73.02 (B)(2)(e) DSC. Because this is a dispositive motion, the report and recommendation is entered for review by the court.

[2]SCDMH and Nurse Brooks, originally named as defendants in this action, were dismissed on June 20, 2012.  See ECF No. 18.

a response on January 22, 2013, and Defendant filed a reply on January 29, 2013.  Defendant filed

a supplemental affidavit to her reply on February 4, 2013, and Plaintiff filed a sur reply on February

11, 2013.  Plaintiff filed an additional (unsigned) sur reply on March 1, 2013.

## STANDARD FOR SUMMARY JUDGMENT

The federal court is charged with liberally construing the complaints filed by pro se litigants,

to allow them to fully develop potentially meritorious cases.  See Cruz v. Beto, 405 U.S. 319 (1972);

Haines v. Kerner, 404 U.S. 519 (1972).  The court's function, however, is not to decide issues of fact,

but to decide whether there is an issue of fact to be tried.  The requirement of liberal construction

does not mean that the court can ignore a clear failure in the pleadings to allege facts which set forth

a federal claim, Weller v. Dep't of Social Servs., 901 F.2d 387 (4th Cir. 1990), nor can the court

assume the existence of a genuine issue of material fact where none exists.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The facts and inferences

to be drawn from the evidence must be viewed in the light most favorable to the non-moving party.

Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991).  The moving party "bears the initial burden

of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs,

945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).  If the

moving party carries this burden, "the burden then shifts to the non-moving party to come forward

with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson, 477 U.S. at

247-48).

## DISCUSSION

In his Amended Complaint (ECF No. 27, p. 2-8) Plaintiff claims that at 11:50 p.m. on March 1, 2009, SCDMH nurse Mrs. Brooks yelled into his cell to check on him, waking him up from a deep sleep and causing his blood pressure to rise. He asserts that his blood pressure remained high and he had an irregular heart beat from that time until March 4, 2009. Plaintiff provides that he has a seventeen year history of irregular heart beat, heart failure, and extreme premature ventricular heart contractions ("PVCs"). He alleges that at 5:15 a.m. on March 4, 2009, SCDMH Mental Health Worker Mrs. Johnson yelled into his cell, asking if Plaintiff's cell mate Mr. Farrow was coming down to medical. This startled Plaintiff out of a deep sleep. At 6:30 a.m., Plaintiff attempted to get out of his bunk, he fell, he got back on his bunk, and he asked Farrow to call medical because Plaintiff was having a heart attack. Farrow went to the SVPTP medical office and requested a nurse, reporting that Plaintiff was dizzy, was staggering around, and could not get up out of bed. Plaintiff claims he faded in and out of consciousness and became extremely lethargic. After a few minutes, SCDMH mental health worker Mrs. Megan asked Plaintiff what was wrong with him. Plaintiff said he was having a heart attack, Mrs. Megan stated it smelled like alcohol in the cell, and Plaintiff replied that the smell was caused by his eating a heavy garlic dinner the pervious night. Plaintiff told Megan to get SCDMH mental health worker Alvin Morton ("Morton").

Plaintiff told Morton that he was having a heart attack, asked Morton to check his blood pressure, and passed out again. Plaintiff alleges that when he came to, an unknown nurse was taking his blood pressure, which she reported as 200/100 with a pulse of 48. He alleges he lost consciousness again, was carried by Morton and Officer Johnson to the SVPTP front office area, and Morton performed an EKG on him. Plaintiff claims there was no trained medical staff on duty who

3

could operate the EKG machine and SCDMH personnel stated there was no operational oxygen bottle/face mask. When Plaintiff awoke again, he was lying on a concrete bunk in the SVPTP Edisto unit holding cell covered with a coat. Farrow told Plaintiff that SCDMH guards were searching their cell for possible drugs or alcohol. Morton allegedly told Plaintiff that, per phone order of Defendant, SCDMH was not going to call EMS until after Nurse Practitioner ("NP") Elshami[3] examined Plaintiff around 8:00 a.m. Plaintiff allegedly again lost consciousness; awoke to Elshami talking to him; lost consciousness again; and came to again at 9:00 a.m., at which time an oxygen mask was put on him and he was put on a gurney by EMS personnel.

Plaintiff was admitted to Richland Memorial Hospital and stayed on the emergency care unit until the next morning (March 5, 2009). Plaintiff claims that during the night of March 4, 2009, he attempted to get out of bed and discovered he had lost the use and control of his left leg. He states that he underwent heart catheterization on March 5, 2009, and stayed in the intensive care unit until March 9, 2009, when he was transported back to the SVPTP Edisto unit. Plaintiff alleges that he informed SVPTP medical staff about his having lost control of the motor function of his left leg, at which time NP Elshami ordered that Plaintiff be seen by the SCDMH private contractor neurologist. Plaintiff claims that the neurologist diagnosed him as having suffered brain damage due to a lack of oxygen. Physical therapy and a cane were prescribed. He alleges that he has had a permanently crippled left leg "since being put into cardiac arrest by Nurse Brooks."

Plaintiff alleges that Defendant Wadman was deliberately indifferent to his medical needs. He claims that Defendant violated his due process and equal protection rights by ordering that he be

_____

[3]Plaintiff refers to the nurse practitioner as Sham-ie or El-Shamie, but the correct name of this individual appears to be "Elshami." See Referral Form (referring Plaintiff to the neurological clinic), ECF No. 55-2, p. 30

placed in the detention holding cell without her personally examining him, detaining him in the holding cell for one and one-half hours, ordering that no heart attack or other medical attention be provided to him, failing to provide him with preventative medical attention for his medical condition (heart failure), and directly or indirectly causing/contributing to his left leg being permanently crippled.  ECF No. 27, p. 10-11. Defendant contends that her motion for summary judgement should be granted because: (1) Plaintiff's Complaint fails to state a cause of action, his claims are frivolous and without merit, there is no genuine issue as to any material fact, and the Complaint does not state a claim upon which relief can be granted; (2) Defendant is entitled to Eleventh Amendment immunity; (3) Defendant is entitled to qualified immunity; (4) Defendant cannot be held liable on a theory of respondeat superior; (5) Plaintiff's claims are barred by the applicable statute of limitations; (6) Plaintiff fails to establish a violation of his due process rights; (7) Plaintiff fails to establish a violation of his equal protection rights; (8) Plaintiff fails to establish that he was denied any medically necessary care, treatment, devices, or other items; (9) Plaintiff fails to establish that Defendant was deliberately indifferent to any substantial risk of serious harm to Plaintiff; (10) Plaintiff fails to present any evidence, including statutorily required expert testimony, showing Defendant deviated from the applicable standard of care; and (11) any state law claims are barred by the applicable provisions of the South Carolina Tort Claims Act, S.C. Code Ann. §§ 15-78-10 through 15-78-220, as amended.[4]

---

[4]Plaintiff only appears to have asserted claims under § 1983.  To the extent he has alleged any state law claims, it is recommended, pursuant to 28 U.S.C. § 1367(c)(3), that the claims be dismissed because Plaintiff fails to show that Defendant violated his rights under § 1983 (as discussed below).

1.     <u>Statute of Limitations</u>

Defendant contends that this action is barred by the applicable three-year statute of limitations because Plaintiff knew or should have known of the alleged action or inaction of Defendant on March 4, 2009, but did not file this action within three years of that date.  Plaintiff argues that this action was timely filed because he deposited his summons and complaint into the SCDMH postal service on February 28, 2012, and his complaint is postmarked March 2, 2009.  He further argues that he did not discover that he had suffered brain damage from his injury until March 8, 2009, when he got out of bed and found he had lost control of his left leg.

State law concerning limitation of actions applies in claims brought under § 1983.  <u>See</u> <u>Wilson v. Garcia</u>, 471 U.S. 261, 266 (1985), superseded by statute on other grounds as stated in <u>Jones v. R.R. Donnelley & Sons Co.</u>, 541 U.S. 369 (2004); <u>see also</u> <u>Burnett v. Grattan</u>, 468 U.S. 42 (1984); <u>Owens v. Okure</u>, 488 U.S. 235 (1989). In South Carolina, the statute of limitations for personal injury torts is generally three years.  <u>See</u>  S.C. Code Ann. § 15-3-530. Additionally, under S.C. Code Ann. § 15-3-545, an action,

> to recover damages for injury to the person arising out of any medical, surgical, or dental treatment, omission, or operation by any licensed health care provider...acting within the scope of his profession must be commenced within three years from the date of the treatment, omission, or operation giving rise to the cause of action or three years from date of discovery or when it reasonably ought to have been discovered, not to exceed six years from date of occurrence, or as tolled by this section.

S.C. Code Ann. § 15-3-545(A).

Defendant argues that based on the above statutes, Plaintiff's claims were only actionable until March 4, 2012, three years after the alleged actions or inactions by Dr. Wadman. In federal court, the Federal Rules of Civil Procedure govern the commencement of a suit for purposes of tolling the state statute of limitations applicable to § 1983 actions. <u>Lewis v. Richmond City Police</u>

Dep't, 947 F.2d 733, 735 (4th Cir.1991). For pro se prisoner litigants bringing § 1983 claims in federal court, filing occurs when the prisoner delivers his pleading to prison authorities for forwarding to the court clerk. Id. at 735–36 (extending the holding of Houston v. Lack, 487 U.S. 266, 270 (1988) to § 1983 cases). The rule has been applied not just to prisoners but also to civil detainees confined in state hospitals as sexually violent predators. See Jones v. Blanas, 393 F.3d 918 (9th Cir. 2004)(explaining that the rule "applies broadly to any 'inmate confined in an institution.' There is no express limitation on the rule's application to prisoners, or to penal institutions...."). Plaintiff is a civilly committed person. The envelope in which Plaintiff's Complaint was mailed is postmarked March 2, 2012.  ECF No. 1-1. Applying the holding of Houston v. Lack, Plaintiff filed this action prior to the expiration of the three-year limitation period.

> 2.     Medical Claims

Plaintiff alleges that Defendant violated his due process rights and was deliberately indifferent to his medical needs. Defendant contends that Plaintiff has not shown that his Fourteenth Amendment rights were violated because he fails to show that Defendant did not meet the standard of professional judgment as to Plaintiff's medical treatment.  She also contends that Plaintiff fails to show that she was deliberately indifferent to his medical needs and that at most he has alleged a disagreement with the provided treatment. Plaintiff argues that he has presented genuine issues of material fact which are in dispute because an eyewitness states that  Plaintiff lost consciousness and no SCDMH nursing staff checked on Plaintiff in the holding cell for close to one and one-half hours.

In Youngberg v. Romeo, 457 U.S. 307 (1982), the Supreme Court of the United States held that the Fourteenth Amendment of the United States Constitution determines the rights of individuals who have been involuntary committed to a facility.  Id. at 312.  Although residents at state

institutions do have constitutionally protected interests, these rights must be balanced against the reasons put forth by the State for restricting their liberties.  Id. at 321. Due process requires that the conditions and duration of confinement under the SVP Act bear some reasonable relation to the purpose for which persons are committed.  See Seling v. Young, 531 U.S. 250, 265 (2001). The Fourteenth Amendment ensures that states will provide not only for the medical needs of those in penal settings, but for anyone restricted by a state from obtaining medical care on his own. DeShaney v. Winnebago, 489 U.S. 189, 200 (1989); Youngberg, 457 U.S. at 324.

In deciding whether a civilly-institutionalized individual's constitutional rights have been violated, the courts must balance the individual's liberty interest against the relevant state interests, but deference must be given to the decisions of professionals.  Youngberg, 457 U.S. at 321.  "[T]he decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."  Id. at 323.  Deference to professionals ensures that federal courts do not unnecessarily interfere with the internal operations of state institutions.  Id. at 322.

To state a claim pursuant to the Fourteenth Amendment requires a plaintiff to provide proof of more than mere negligence in diagnosing and treating medical complaints.  Patten v. Nichols, 274 F.3d 829 (4th Cir. 2001).  While courts have not adopted a consistent standard, there is agreement that the professional judgment standard requires more culpability than mere negligence. Compare Yvonne L. v. New Mexico Dep't of Human Servs., 959 F.2d 883, 894 (10th Cir. 1992)(doubting whether "there is much difference" between the deliberate indifference standard and the Youngberg standard), with Doe v. New York City Dep't of Soc. Servs., 709 F.2d 782, 790 (2d Cir. 1983)(stating

that in <u>Youngberg</u>, "the Court adopted what is essentially a gross negligence standard"); <u>see also</u>

<u>Shaw v. Strackhouse</u>, 920 F.2d 1135, 1146 (3d Cir. 1990)("Professional judgment, like recklessness

and gross negligence, generally falls somewhere between simple negligence and intentional

misconduct.").

In support of this action, Plaintiff submitted copies of medical records indicating that he

received treatment (at the SVPTP and outside the facility) for his heart condition, including

medication, examination by a cardiologist, and heart catheterization, prior to the alleged incident on

March 4, 2009. Plaintiff submitted an affidavit from SVPTP resident James Gibson ("Gibson")who

states he was housed in the cell next to Plaintiff's cell, he witnessed Plaintiff lying on the floor

outside Plaintiff's cell (cell 219) in an unconscious state at around 6:40 a.m. on March 4, 2009, he

saw Morton and PSC Johnson pick Plaintiff up and carry him to the Edisto unit medical office, he

witnessed Plaintiff (who was unconscious) being wheeled to a holding cell, he saw Morton and

Farrow sit with Plaintiff until a few minutes after 8:00 or 8:10 a.m., and Plaintiff was then taken to

the Edisto unit medical office. Gibson states that while Plaintiff was in the Edisto unit holding cell

between 6:40 a.m. and 8:10 a.m., Gibson did not witness any SCDMH medical or nursing staff

monitor Plaintiff or talk to Morton.  Gibson Aff. I, ECF No. 68-2.  In a second affidavit, Gibson

states that he was a state-certified emergency and rescue attendant from 1974 to 1987 in Laurens

County, South Carolina; he witnessed Plaintiff on the morning of March 4, 2009 appear to be

unresponsive/unconscious; he saw Morton and Johnson carry Plaintiff to the SCDMH medical care

area; Plaintiff appeared ashen with poor coloration in his face and arms; approximately ten minutes

after being taken to the medical office, Plaintiff was taken to a holding cell; and he did not witness

SCDMH medical or nursing staff monitor Plaintiff or talk to Morton from 6:40a.m. to 8:10a.m. on

March 4, 2009. Gibson states that it is his opinion Plaintiff was suffering from heart failure or stroke and that no proper medical procedures for heart failure "or otherwise" were administered. Gibson Aff. II, ECF No. 74-1.

Virginia Suber, Administrative Coordinator I of the Forensic and SVPTP, submitted copies of Plaintiff's medical records. ECF No. 55-2. In a Practitioner Order on March 4, 2009 at 6:45 a.m., registered nurse Cassandra Lassiter wrote that Defendant directed (in a phone order) Plaintiff's blood sugar and EKG be taken "now"; Defendant was to be called with the results; Plaintiff was to be placed on observation until seen by the nurse practitioner; and if there were any changes in Plaintiff's condition (including, numbness, or tinging), he should be sent to the emergency room. ECF No. 55-2, p. 3. Notes from Monica E. Eddy ("Eddy"), a registered nurse, indicate Plaintiff's roommate reported at 6:45 a.m. that Plaintiff complained of irregular heartbeats, weakness, and stumbling. At 6:45 a.m., Plaintiff was assessed by SVPTP nursing staff and it was noted that his blood pressure was 200/100, pulse rate was 100, and respiration rate was 18. It was noted that Plaintiff's respiration was shallow with no shortness of breath. Plaintiff was alert to name and place. He was assisted to a wheelchair for further assessment at the nursing station. At the time, his blood pressure was 182/106, pulse rate was 80, respiration rate was18, and blood sugar was 110. Nurse Eddy noted that Defendant was contacted by phone, an EKG was ordered, and the results were to be called back to Defendant. Plaintiff was placed on an examination table, at which time his pulse oxygen level on room air was 100 percent and his heart rate was 80. She wrote that Plaintiff's EKG was normal sinus rhythm 70, Plaintiff remained alert, and he was verbally responsive. Plaintiff reported that he had PVCs which were "coming in and out." Nurse Eddy notified Defendant of the results of the EKG, and orders were received for close observation by nursing staff, further evaluation from the nurse

practitioner, and transfer to the emergency room if there was any acute onset of tingling, numbness, or diaphoresis. ECF No. 55-2, p. 6. NP Elshami completed a transfer note indicating that on March 4, 2009, Plaintiff's vital signs included blood pressure 200/100, pulse 100, and respiration 18. NP Elshami indicated that Plaintiff complained of substantial chest pain with radiation to left arm and left arm numbness, Plaintiff had atypical chest pain previously, and aspirin was given to Plaintiff at 8:42 a.m. ECF No. 55-2, p. 4. The incident report provides that an ambulance transport arrived at 8:33 a.m. and departed at 9:00 a.m.. ECF No. 55-2, p. 5.

Medical records from Dr. Stephen Shelton at Palmetto Richland Hospital on March 4, 2009, indicate that Plaintiff reported he had a near syncopal episode and fell out of bed, his roommate assessed him, SCDMH staff assessed him, he had another near syncopal episode, and staff reported that Plaintiff did not lose consciousness. EKG revealed normal sinus rhythm without any acute signs of an ST elevation myocardial infarction, a chest x-ray was without acute process, and liver function tests were within normal limits except for a slight elevation of Plaintiff's SGPT. Although Plaintiff remained stable, Dr. Shelton was concerned about cardiac etiologies. Dr. Shelton contacted Plaintiff's cardiologist Dr. Omoigui and Plaintiff was admitted to the chest pain unit under observation status. ECF No. 55-2, p. 8-10. Dr. Solomon Chesoni noted that Plaintiff had two sets of cardiac enzymes which revealed no evidence of acute event. He recommended that myocardial perfusion imaging or repeat cardiac catheterization (he noted Plaintiff had cardiac catheterization performed previously in October 2005) and Dr. Omoigui make a final disposition when Plaintiff was seen in the morning. ECF No. 55-2, p. 11-12. A CT of Plaintiff's head on March 4, 2009 indicated no acute intracranial abnormalities. ECF No. 55-2, p. 13. Cardiac catheterization was performed on

March 5, 2009 by Dr. Nowamagbe Omoigui, with stenting of the mid and distal segments of Plaintiff's right coronary artery. ECF No. 55-2, p. 19-21.

After being returned to SCDC, Plaintiff received further care there. Plaintiff received a consultation in the neurology clinic on March 31, 2009 for complaints that his left side was numb and weaker than his right side. A CT of Plaintiff's brain was ordered. ECF No. 55-2, p. 29. On April 30, 2009, Plaintiff was diagnosed with cerebrovascular atherosclerosis[5] for which it was noted that Plaintiff was already given Plavix and aspirin. A carotid ultrasound was ordered. ECF No. 55-2, p. 33. On June 2, 2009, Plaintiff was referred to physical therapy for reconditioning. ECF No. 55-2, p. 35.[6]

In her affidavit, Defendant states that around 6:45 a.m. on March 4, 2009, she received a phone call from a nurse at the SVPTP informing her that Plaintiff reported (via his roommate) that he had irregular heartbeats, was weak, and was stumbling. Defendant issued a verbal telephone order for an EKG and a finger stick blood glucose test. She also ordered that Plaintiff be placed under close observation by nursing staff while the tests were being done and if any changes were observed in Plaintiff (including but not limited to profuse sweating, tingling, or diaphoresis) medical staff was to immediately send him to the emergency room. Dr. Wadman states she also advised staff that if they believed Plaintiff was in any acute distress or believed he needed additional medical care, they should send him to the emergency room. The EKG and blood sugar test were normal and Dr.

---

[5]Atherosclerosis is the "formation of deposits of yellowish plaques (atheromas) containing cholesterol, lipoid material, and lipophages in the intima and inner media of large and medium-sized arteries." Dorland's Illustrated Medical Dictionary, 172 (32nd ed. 2012).

[6]Contrary to Plaintiff's assertions, there is no indication in the medical record that he suffered a heart attack.

Wadman believed Plaintiff should be observed by the nursing staff and evaluated by the nurse practitioner who, by the time the results of the tests were reported to Dr. Wadman, was scheduled to arrive at the SVPTP unit within the next thirty minutes.  Dr. Wadman states that PVCs are a relatively common event that may be perceived as a "skipped beat" or felt as palpitations in the chest, but do not usually pose a danger. Wadman Aff., ECF No. 30-1.

Here, Defendant reasonably relied on her professional judgment in directing medical personnel at the SVPTP to obtain vital signs and administer an EKG, observe Plaintiff, and wait a short period of time for the nurse practitioner to assess Plaintiff.  Defendant directed these medical professionals to call EMS if there were certain changes in his condition. Plaintiff appears to argue that if professional judgment was used, he would have been sent to the hospital sooner.  He, however, has provided nothing but his own assertion concerning this. Medical records from the hospital fail to support Plaintiff's assertions.

Plaintiff appears to argue that his medical claims should be analyzed under the Eighth Amendment deliberate indifference standard.  Defendant argues that this standard is not applicable because Plaintiff is not a prisoner.  Alternatively, Defendant contends Plaintiff has not shown that she disregarded any of Plaintiff's serious medical needs.  She argues that Plaintiff's claim appears to be a disagreement with the treatment given which does not rise to the level of a constitutional violation.    Although it is unclear what constitutes failure to meet the professional judgment standard, it is at least co-extensive with deliberate indifference as discussed above. See City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244 (1983)(The Fourteenth Amendment affords pretrial detainees protections that are "at least as great as the Eighth Amendment protections afforded

to a convicted prisoner."). Here, under the Eighth Amendment deliberate indifference standard, Plaintiff fails to show that his constitutional rights were violated by Defendant.

In the case of <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976), the Supreme Court reviewed the Eighth Amendment prohibition of punishments which "involve the unnecessary and wanton infliction of pain," <u>Id.</u>, quoting <u>Gregg v. Georgia</u>, 428 U.S. 153, 169-73 (1976).  The court stated:

> An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.
>
> \* \* \* \* \* \* \*
>
> We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," <u>Gregg v. Georgia</u>, <u>supra</u>, at 182-83, 96 S.Ct. at 2925 (joint opinion), proscribed by the Eighth Amendment.  This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.  Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

<u>Estelle</u>, 429 U.S. at 103-105. (Footnotes omitted).

Despite finding that "deliberate indifference to serious medical needs" was unconstitutional, the court was careful to note however, that "an inadvertent failure to provide adequate medical care" does not meet the standard necessary to allege an Eighth Amendment violation.

> Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.  In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

<u>Estelle</u>, 429 U.S. at 106.

The Court of Appeals for the Fourth Circuit also considered this issue in the case of <u>Miltier v. Beorn</u>, 896 F.2d 848 (4th Cir. 1990).  In that case, the court noted that treatment "must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness (citations omitted). . . nevertheless, mere negligence or malpractice does not violate the Eighth Amendment." <u>Id</u>. at 851.

The Supreme Court defined "deliberate indifference" in the Eighth Amendment context in <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994).  The court held:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.  This approach comports best with the text of the Amendment as our cases have interpreted it.  The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments."  An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation.  The common law reflects such concern when it imposes tort liability on a purely objective basis.  [Citations omitted].  But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

<u>Id</u>. at 837-838.

Unless medical needs were serious or life threatening, and the defendants were deliberately and intentionally indifferent to those needs of which he was aware at the time, a plaintiff may not prevail.  <u>Estelle</u>, 429 U.S. at 106; <u>Farmer v. Brennan</u>, 511 U.S. at 837-838; <u>Sosebee v. Murphy</u>, 797 F.2d 179 (4th Cir. 1986).

Plaintiff fails to show that Defendant was deliberately indifferent to any of his serious medical needs.  As noted above, Defendant submitted medical records indicating that Plaintiff was examined

by a registered nurse, the facility's medical director (a physician) was consulted by telephone, he was observed by a mental health care worker at the facility, his blood pressure was taken, an EKG was administered, his blood sugar level was tested, aspirin was given, he was seen by a nurse practitioner, and he was transferred to the hospital to receive further care.

Plaintiff appears to argue, based on affidavits from SVPTP resident Gibson, that there are genuine issues of material fact as to whether he lost consciousness and as to whether medical personnel monitored him during that time he was in the holding cell. Plaintiff fails to show that any disagreements as to these issues shows a lack of professional judgment or deliberate indifference. Further, Gibson's own statements contain contradictory information, in that he asserts that Plaintiff was in a holding cell from 6:40a.m. and 8:10 a.m., yet he reported seeing Plaintiff outside of his cell at 6:40, saw Plaintiff carried to the medical office, and saw Plaintiff wheeled out of the medical office approximately ten minutes later. Gibson Aff. I, ECF No. 68-2. Additionally, in his Amended Complaint, Plaintiff states that a nurse came to his cell and took his blood pressure, he was taken to the medical office before going to the holding cell, an EKG was performed, mental health care worker Morton was with him in the holding cell, and he was seen by NP Elshami. Amended Complaint, ¶¶ 6p, 6u, 7, 7a, and 7c, ECF No. 27. Medical records from the hospital do not indicate that Plaintiff lost consciousness before being brought to the hospital, instead noting that Plaintiff "denied syncope." The notes provide that Plaintiff reported a "near" syncopal episode and fell out of bed, and staff reported he did not lose consciousness. See ECF No. 55-2, p. 8, 11.

To the extent Plaintiff alleges a claim based on a delay in treatment, he fails to show that the delay resulted in some substantial harm or that it created a substantial risk of serious harm of which Defendant was aware. See, e.g., Webb v. Hamidullah, 281 F. App'x 159 (4th Cir. 2008)(Eighth

Amendment violation only occurs if the delay results in some substantial harm to the patient); Sealock v. Colorado, 218 F.3d 1205, 1210 (10th Cir. 2000) ("Delay in medical care only constitutes an Eighth Amendment violation where the plaintiff can show that the delay resulted in substantial harm."); Mendoza v. Lynaugh, 989 F.2d 191, 195 (5th Cir. 1993)(same); Wood v. Housewright, 900 F.2d 1332, 1335 (9th Cir. 1990)(same). But see Blackmore v. Kalamazoo County, 390 F.3d 890, 899 (6th Cir. 2004)("This [constitutional] violation is not premised upon the 'detrimental effect' of the delay, but rather that the delay alone in providing medical care creates a substantial risk of serious harm [of which prison officials are aware]."). Plaintiff fails to show that any delay created a substantial risk of serious harm to which Defendant was aware. As noted above, Defendant was in contact with medical personnel, tests were ordered, Plaintiff was monitored, the nurse practitioner was to examine Plaintiff, and SVPTP staff was directed to send Plaintiff to the hospital if there was a change in his condition. Plaintiff has presented nothing to show that any delay in treatment caused him harm. Although Plaintiff claims that delay in treatment caused neurological problems, he has presented only his own opinion to support this. Plaintiff's medical records fail to reveal that any neurological problems were caused by any delay in taking him to the emergency room on March 4, 2009.

Plaintiff's claim is at most a disagreement with the type and amount of medical treatment he received. "Although the Constitution does require that prisoners be provided with a certain minimum level of medical treatment, it does not guarantee to a prisoner the treatment of his choice." Jackson v. Fair, 846 F.2d 811, 817 (1st Cir. 1988). The provision of medical care by prison officials is not discretionary, but the type and amount of medical care is discretionary. See Brown v. Thompson, 868 F. Supp. 326 (S.D.Ga. 1994). A disagreement as to the proper treatment to be received does not

in and of itself state a constitutional violation. <u>See</u> <u>Smart v. Villar</u>, 547 F.2d 112 (10th Cir. 1976);

<u>Lamb v. Maschner</u>, 633 F. Supp. 351, 353 (D.Kan. 1986). Although Plaintiff believes that he should

have received different medical treatment, he fails to show that Defendant's actions or inactions rose

to the level of a constitutional violation.

3.    <u>Equal Protection</u>

Plaintiff alleges that his equal protection rights were violated.   Defendant contends

that Plaintiff has not established an equal protection claim because he has not shown that he was

treated any differently than any other resident in a situation similar to his and he has not shown that

any unequal treatment was due to intentional or purposeful discrimination.

An equal protection claim arises when, without adequate justification, similarly-situated

persons are treated differently by a governmental entity.  U.S. Const. amend XIV.  "To succeed on

an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from

others with whom he is similarly situated and that the unequal treatment was the result of intentional

or purposeful discrimination."  <u>Morrison v. Garraghty</u>, 239 F.3d 648, (4th Cir. 2001).  When the

distinction is based on a "suspect classification" or effects the denial of a fundamental right, the

constitutional scrutiny sharpens in focus to determine whether the classification is narrowly tailored

to serve a "compelling governmental interest."  <u>See</u> <u>Plyler v. Doe</u>, 457 U.S. 202, 216-17 (1982).

When a plaintiff is not a member of a suspect class he must prove that the distinction between

himself and other inmates was not reasonably related to some legitimate penological purpose.  <u>See</u>

<u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987).

18

Plaintiff has not asserted that he is a member of a suspect class. He has not shown that he was treated any differently than a similarly-situated SVPTP resident.  Further, he has not shown that any alleged mistreatment was the result of intentional or purposeful discrimination.

4.      Respondeat Superior

To the extent Plaintiff alleges that Defendant should be liable on a theory of respondeat superior, his claim fails. The doctrine of respondeat superior generally is inapplicable to § 1983 suits, such that an employer or supervisor is not liable for the acts of his employees, absent an official policy or custom which results in illegal action.  See Monell v. Department of Social Services, 436 U.S. 658, 694 (1978); Fisher v. Washington Metro Area Transit Authority, 690 F.2d 1133, 1142-43 (4th Cir. 1982).  Higher officials may be held liable for the acts of their subordinates, however, if the official is aware of a pervasive, unreasonable risk of harm from a specified source and fails to take corrective action as a result of deliberate indifference or tacit authorization.  Slakan v. Porter, 737 F.2d 368 (4th Cir. 1984), cert. denied, Reed v. Slakan, 470 U.S. 1035 (1985). Here, Plaintiff has failed to make such a showing.

5.      Immunity

Defendant contends that she is entitled to Eleventh Amendment immunity.  When a defendant is sued in his or her official capacity, the suit is frequently intended as one against the state, the real party in interest.  If review of the pleadings indicates that the state is, in fact, the party being sued, then a judgment awarding damages is precluded by the Eleventh Amendment of the United States Constitution.  Although declaratory and/or injunctive relief may be granted, damages may not be awarded against the state.  In the case of Will v. Michigan Department of State Police,

491 U.S. 58 (1989), the Supreme Court analyzed the interplay between § 1983 and the Eleventh

Amendment of the Constitution and stated:

> Section 1983 provides a federal forum to remedy many deprivations of civil
> liberties, but it does not provide a federal forum for litigants who seek a
> remedy against a State for alleged deprivations of civil liberties. The
> Eleventh Amendment bars such suits unless the State has waived its immunity
> [cites omitted] or unless Congress has exercised its undoubted power under
> § 5 of the Fourteenth Amendment to override that immunity.

Id. at 66.

The Eleventh Amendment immunity granted to the states "applies only to States or

governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes," but

the court found that state agencies, divisions, departments, and officials are entitled to the Eleventh

Amendment immunity. Id. at 70. In reaching this conclusion, the court held that a suit against state

officials acting in their official capacities is actually against the office itself and, therefore, against

the state. State officials may only be sued in their individual capacities. Thus, Defendant is entitled

to Eleventh Amendment immunity from damages in her official capacity.

Defendant also contends that she is entitled to qualified immunity in her individual capacity.

The Supreme Court in Harlow v. Fitzgerald, 457 U.S. 800 (1982), established the standard which the

court is to follow in determining whether a defendant is protected by qualified immunity.

> Government officials performing discretionary functions generally are
> shielded from liability for civil damages insofar as their conduct does not
> violate clearly established statutory or constitutional rights of which a
> reasonable person would have known.

Id. at 818.

The Court of Appeals for the Fourth Circuit, discussing qualified immunity, stated:

> Qualified immunity shields a governmental official from liability for civil
> monetary damages if the officer's "conduct does not violate clearly

20

established statutory or constitutional rights of which a reasonable person would have known." "In determining whether the specific right allegedly violated was 'clearly established,' the proper focus is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged." Moreover, "the manner in which this [clearly established] right applies to the actions of the official must also be apparent." As such, if there is a "legitimate question" as to whether an official's conduct constitutes a constitutional violation, the official is entitled to qualified immunity.

Wiley v. Doory, 14 F.3d 993 (4th Cir. 1994)(internal citations omitted), cert. denied, 516 U.S. 824 (1995). As discussed herein, Plaintiff fails to show that Defendant violated any of his clearly established constitutional or statutory rights. Therefore, Defendant is entitled to qualified immunity in her individual capacity.[7]

## **CONCLUSION**

Based on review of the record, it is recommended that Defendant's motion for summary judgment (ECF No. 55) be **granted**.

Joseph R. McCrorey
United States Magistrate Judge

May 14, 2013
Columbia, South Carolina

**The parties' attention is directed to the important information on the attached notice.**

---

[7]Plaintiff argues that Defendant is not entitled to qualified immunity because she has not presented anything to show that she took an oath of office. Plaintiff fails to present any authority to support this argument. Further, Wadman states that she was an employee of the SCDMH (and still is) at the time of the alleged incidents. Plaintiff has presented nothing other than his own speculation that Defendant is not a SCDMH employee.

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).